# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **MATTHEW SCHROEDER, et al.,** | : | **Case No. 3:02-CV-7311** |
| | : | |
| **Plaintiffs,** | : | **JUDGE JAMES G. CARR** |
| | : | |
| **vs.** | : | **Thomas A. Sobecki (0005210)** |
| | : | 520 Madison Ave. Suite 811 |
| **MAUMEE BOARD OF EDUCATION,** | | Toledo, OH 43604 |
| **et al.,** | : | Telephone: 419-242-9908 |
| | | Fax: 419-242-9937 |
| **Defendants** | : | E-mail: tsobecki@tomsobecki.com |
| | : | Attorney for Plaintiffs |

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Defendants have filed a Motion for Summary Judgment to which the instant Response is being made. Because evidence exists which demonstrates genuine issues of material fact, Defendants are not entitled to summary judgment. Plaintiffs therefore request this Court to deny Defendants' motion. A Memorandum in Support follows and sets forth a full explanation of triable issues.

Respectfully submitted,

Thomas A. Sobecki (0005210)
Attorney for Plaintiffs

# TABLE OF CONTENTS

Page

I.   STATEMENT OF THE ISSUES.................................................................  1

II.  INTRODUCTION AND SUMMARY OF ARGUMENT..........................  2

III. STATEMENT OF FACTS.........................................................................  4

IV.  ARGUMENT..............................................................................................  14

    A.    Summary judgment standard...............................................................  14

    B.    Defendants are not entitled to summary judgment on plaintiffs'
        claims under 42 U.S.C. § 1983.........................................................  14

        1.    Defendants violated plaintiff's First Amendment right of
            free speech and his right to equal protection.........................  14

        2.    Defendant Maumee Board of Education may be held liable
            on plaintiff's § 1983 claim because evidence demonstrates
            that plaintiff was deprived of his rights of free speech and
            equal protection due to a policy or practice of the board......  18

    C.    Defendants are not entitled to summary judgment on plaintiffs'
        Title IX claim.....................................................................................  18

V.   CONCLUSION..........................................................................................  28

CERTIFICATE OF SERVICE……………………………………………….  29

Ex. 1   Affidavit of Meredith Weiss

Ex. 2 Certification by Thomas Sobecki

i

## I.     STATEMENT OF THE ISSUES

(1) Whether defendants violated plaintiff's First Amendment rights, when they did not explicitly forbid the speech, but where they failed to intervene in harassment plaintiff suffered because he spoke out on the issues.

(2) Whether defendants had notice of the harassment, where both the student and his mother repeatedly told school administrators and teachers of the harassment.

(3)  Whether the school board is free from liability on the basis that they had no knowledge of the harassment, where school administrators had knowledge of the harassment.

(4) Whether plaintiffs have supported their title IX claim, where they have presented evidence that school administrators and teachers had been repeatedly notified of the harassment, and where the harassment was both severe and pervasive.

## II.  INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs have filed a complaint contending that Matthew Schroeder, who is a heterosexual but whose brother is homosexual, was for several years the victim of serious physical and mental harassment by students at two schools in the Maumee, Ohio school system, based upon the students' perception of Matthew's sexual orientation and his tendency to talk about gay rights issues.  Plaintiffs contend that school officials were notified of the harassment but refused to take reasonable steps to end it, with the ultimate result that Matthew's parents were forced to withdraw him from the Maumee school system.  Plaintiffs contend that the indifference shown by defendants resulted in a violation of Matthew's free speech rights under the First Amendment, his right to equal protection under the fourteenth amendment, and his educational rights under title IX.

In defendants' motion for summary judgment, defendants contend that they did not stop Matthew from speaking out on gay issues, that they had no obligation to protect him from the actions of other students, and that he was not discriminated against or disciplined because of the perception that he was gay.  Defendants also claim that the school board may not be held liable because they had a policy against sexual harassment.  Finally, defendants contend that the school board did not have knowledge of any sexual harassment, and that in any event, any harassment was not severe and pervasive.

In the instant response, plaintiffs set forth evidence creating factual questions with regard to each of defendants' asserted bases for summary judgment.  Defendants are therefore not entitled to summary judgment.

### III.    STATEMENT OF FACTS

For ease of distinguishing the April 9, 2001, Deposition testimony of Matthew Schroeder from the April 24, 2001, Deposition testimony of his mother, Sandra Schroeder, Matthew's testimony will be cited as "Matthew depo. p. ___" and Sandra's testimony will be referred to as "Sandra depo. p. ___." Matthew's May 23, 2003, deposition testimony will be referred to as "Matthew depo. II p. ___".

Matthew went to elementary school at Fort Miami. It is clear that there was already a culture of refusal to meaningfully intervene in the harassment of Matthew Schroeder in the Maumee school system. In the fourth grade, kids made comments to Matthew arising from his brother's homosexuality about twice a week. He told his fourth grade teacher, Mr. Sabo, about it. Matthew depo. p. 46. The comments continued into the fifth grade, only they occurred almost daily. Matthew depo. p. 47. He told his teacher, Mrs. Judy, about the comments, and she said that she would talk with the kids, but the comments never subsided. Matthew depo. p. 48. Matthew did not initiate the conversations leading to these comments; the kids initiated the comments, and Matthew would respond by saying things like "why would you persecute gays if they haven't done anything to you? " Matthew depo. pp. 52-53. Matthew did not want to fight with kids, so when they would make their comments, he would just walk away. Matthew depo. pp. 56-57. Occasionally, when someone made such comments, Matthew would respond by calling the speaker a name. Matthew depo. pp. 60-61.

In fifth grade, one of the persons who regularly picked on Matthew was Ashley Kroll. In fifth grade, Matthew and Ashley and other fifth graders had bowled together at a bowling alley. In the bowling alley, Matthew repaid another student some money he had borrowed, and Ashley,

having observed this transaction, said to Matthew, "Are you giving him that money because you want to suck him, you little fag?" Matthew explained that he was just repaying the child some money he owed. Matthew depo. pp. 76-77. Then, on the bowling alley bus on the way back, Ashley said, "Are you sure you don't want to suck him?" At that point, having twice been accused by Ashley of wanting to commit a homosexual act, Matthew responded by calling her a name. Following a brief round of name-calling, Ashley and another child, Selena DeLeon, called Matthew a "queer" and started kicking him, and Ashley jumped on Matthew with her knees on him. Matthew depo. pp. 76-79. Matthew had to be helped from the bus and was taken to the hospital. Matthew depo. p. 78.

After this beating by Ashley and Selena, Ashley continued to "mess with" Matthew. Matthew depo. p. 71. A mediation was held to try to resolve the problem, but things did not improve, and Ashley did not stay away from Matthew even after mediation. Matthew depo. p. 71. Ashley would "flip [Matthew] off," try to trip him, and make dirty faces at him. Matthew depo. pp. 71-72. Ashley continued to picked on Matthew. Matthew depo. p. 84 Matthew was not messing with Ashley, tried to stay away from her, and would walk away if she called him names.. Matthew depo. p. 72, 84.

In the seventh grade, a number of students called Matthew a "fag." Matthew depo. pp. 116-119. This would occur in the bus and in the hallway and in the yard, and sometimes in Mr. Smaltz's class. Matthew depo. p. 118. When Matthew was in the sixth grade, he told defendant Conroy about the students making fun of him. Matthew depo. p. 119. Defendant Conroy stated that he would take care of it. Matthew told Conroy in the cafeteria about the students calling him names and that they were making fun of his gay brother, and were making fun of Matthew about

4

his gay brother. Matthew depo. pp. 120-121. Conroy told Matthew to come to the office, so Matthew followed him, and after Conroy asked Matthew which brother was gay, Conroy said, "So are you a fag, too?" Matthew depo. p. 120; Matthew depo. II p. 15. Defendant Conroy then said that he "would take care of those boys." Ibid. Conroy also stated, "You can learn to like girls. Go out for the football team." Matthew depo. p. 121, 125. This conversation took place toward the middle of the school year. Ibid. During the sixth grade, Matthew also told his guidance counselor, Mr. Hoops, about the kids making fun of him. Matthew depo. p. 124, 132-133. At a different meeting, defendant Conroy suggested to Matthew that if he shut his mouth about gay rights, he would stop getting into so many fights. Matthew depo. p. 125. In October 1999, defendant Wilson and defendant Conroy told Matthew that the school district could not keep him safe. Matthew depo. p. 134. This occurred in response to an incident in which one of the students started punching Matthew, and another student walked by and said, "that's what you get, you little fag." In response to that statement, Matthew chased the student and when he got close and the student turned around, his hand connected with her eye. Matthew depo. pp. 135-136. Wilson and Conroy told Matthew that he had to stay in the basement until he found another school. Matthew depo. p. 137.

Students who were friends with Matthew would then be made fun of for being friends with Matthew, so they would change from being his friend. Matthew depo. pp. 116-117, 154.

In the seventh grade, Matthew was beaten up in the bathroom by two eighth-graders. The beatings were accompanied by comments about Matthew's sexual orientation. Matthew depo. pp. 156-157. Matthew's attackers slammed his head in a urinal and chipped his truth on the urinal. Matthew depo. II p. 62. One of the children told Matthew, " Drink the pee you little fag."

5

Matthew depo. p. 178. Matthew told Mr. Smaltz about the beatings, but Mr. Smaltz did not believe him. Matthew depo. p. 157. It was Matthew, and not his attackers, who ended up getting into trouble over the incident. Ibid.

"Tons of times" eighth graders at Gateway harassed Matthew by calling him fag, queer, and similar appellations. Matthew depo. pp. 158-159. He tried to ignore them. Ibid. He reported those incidents to his mother. Matthew depo. pp. 159-160. He told Mr. Conroy about the incidents, and Mr. Conroy stated that he would take care of it. Matthew depo. p. 160. This occurred on more than one occasion. Matthew depo. p. 161. On more than one occasion, Matthew would go into the gym, and two of the wrestlers would follow him and chase him. Matthew depo. p. 162. He reported the matter to Mr. Ashner on at least the first occasion, but the behavior continued. Ibid.

Many of the fights for which Matthew was disciplined started because the other students involved called Matthew fag and similar appellations, and Matthew would retaliate. Matthew depo. pp. 164-165. On the school bus, one of the students pushed Matthew against the window and said, "Kiss it, you little fag. Kiss it." At the same time, another student, a friend of the first student, came onto the seat in front of Matthew, put his hand through the gap and pulled Matthew's ear. Matthew pushed one of them on the back side of the shoulder, and got in trouble for. Matthew depo. p. 166.

Defendants open their statement of "UNDISPUTED FACTS" with a list of disciplinary actions against Matthew in the sixth grade. However, as to many of these purported disciplinary

6

actions, it is undisputed,[1] for purposes of this motion for summary judgment, that the disciplinary

actions were simply another part of the harassment suffered by Matthew, since in most cases,

Matthew was the victim, rather than the aggressor.  The following paragraphs (indented and

single spaced to correspond to defendants' indentation and single spacing) respond item by item

to the allegations of the indented paragraphs contained in pp. 4-6 of defendants' Motion for

Summary Judgment.

> Contrary to the allegations of the August 27, 1998, disciplinary action, Schroeder did not push the child into the warming pan but was himself pushed into the child. Matthew depo. pp. 139-140.

> Contrary to the allegations of the September 3, 1998, disciplinary action, Matthew has never called a girl a lesbian.  Matthew depo. pp. 126-127.

> With regard to the November 9, 1998, Disciplinary Office Referral itself, Matthew was disciplined because he "was pushed down by [another student] before band." The referral does not indicate that Matthew himself did anything wrong, but only that he was the victim.  See defendants' Ex. C, Disciplinary Office Referral, dated 11-9-98.

> With regard to the alleged November 9, 1998, bus incident, while it is true that the report does not indicate that Matthew was being harassed, it also does not indicate that he was not being harassed, or that the incident was not provoked by the other child. It does not indicate that Matthew was asked for his side of the story. It is simply silent in that regard.  See defendants' Ex. C, School Bus Conduct Report dated November 9, 1998.

> Defendants' reference to an incident which allegedly occurred on a school bus on November 20, 1998, is inaccurate in the first place, and is based strictly on hearsay.  An unidentified student allegedly told the bus driver that Matthew mouthed the word "bitch" to her.  The bus driver admits that she did not hear it.

---

[1]Plaintiffs are not suggesting, of course, that the factual bases for these disciplinary actions are not "in fact" disputed, or that they would not be disputed at trial.  However, for purposes of this motion, plaintiffs' version of the facts, where supported by evidence, must be accepted as true.

7

This is strictly inadmissible hearsay, and may not be relied upon to support the motion.[2] See defendants Ex. D.

While the alleged December 4, 1998, incident appears to be straightforward enough, it appears to be merely rowdy behavior of 3 typical sixth graders, one of whom was Matthew. There is no indication that behavior was directed against any other child. See defendants Ex. D.

While, as defendants say, the alleged December 16, 1998, incident report does not indicate that Matthew was provoked by any harassment, it also does not indicate that he was not provoked by any harassment or that he was not responding to an attack on him. It does not indicate that Matthew was asked for his side of the story. It is simply silent in that regard. See defendants Ex. C, "Notice of suspension," dated December 16, 1998.

There is no non-hearsay evidence that the accusations concerning Matthew with regard to the January 11, 1999, alleged incident have any truth. The exhibits cited by defendants are based solely upon hearsay ("... people told me"). Because the report is based strictly upon hearsay, it is inadmissible and may not be relied upon to support the motion.

With regard to the alleged January 21, 1999, discipline of Matthew for allegedly making racist comments, the document of that date in Ex. C does not indicate what the alleged racist comment was, and defendant Conroy in his deposition admitted that he did not know what the "racist" comment or comments were. Matthew never called anyone a "nigger," with one exception. Matthew depo. pp. 126, 147, 212. Matthew called a child a nigger after that child called Matthew a fag, and told Matthew that he treated his mom like a "hoe" [whore]. Matthew depo. pp. 212-213.

---

[2]Defendant presumably is offering the records contained in exhibits C and D under the business records exception to the hearsay rule, Fed.R.Evid. 803(6). This rule provides an exception to the hearsay rule for a "memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, ..." Assuming that the records contained in exhibits C and D generally are admissible under that exception, they are not admissible to prove hearsay contained within. Thus, even if the bus driver's report of what she personally witnessed may be admissible to prove the truth of what she reported witnessing, it obviously may not be used to prove the truth of what a third person reported to the bus driver.

With regard to the February 2, 1999, incident in which Matthew allegedly kicked a girl in the hall and called her a "bitch," Matthew had no recollection of that incident, Matthew depo. p. 148, and defendant Conroy admitted that he had no personal knowledge of the incident, Conroy depo. pp. 89-90. Defendants have submitted no evidence as to whether the incident was or was not provoked by the girl.

With regard to the March 3, 1999, incident in which Matthew was disciplined for allegedly making racist comments on the school bus, the "racist comments " were comments about the KKK. The only testimony with regard to this allegation is defendant Conroy's personal opinion that Matthew was harassing the other boy by talking about the KKK. Matthew's testimony, which must be accepted as true for purposes of defendants' Motion for Summary Judgment, is that he told a friend that he (the friend) was acting like he belonged in the KKK, because he (a friend) was saying things about an African-American child on the bus, such as that the black child did not belonged in Maumee. Matthew depo. II 57-58.

With regard to the March 17, 1999, discipline of Matthew for allegedly yelling "screw you" in class, Matthew had no recollection of the incident. Matthew depo. p. 149.

With regard to the March 18, 1999, suspension of Matthew after allegedly being in a fight with another student, defendant Conroy admitted that he could remember nothing more than that there was a fight between Matthew and another boy. Conroy depo. pp. 68-70. Likewise, the Disciplinary Office Referral, Ex. C, dated March 18, 1999, gives no further details. There is no indication that the fight was not provoked by harassment from the other child.

With regard to the April 20, 1999, accusations that Matthew harassed another child to the point of tears, defendant Conroy never suggested that he had any personal knowledge of the alleged incident, and admitted that he did not know what the underlying disagreement was, but recommended that both boys go through peer mediation. Conroy depo. p. 104. Likewise, Ex. C, the Disciplinary Office Referral dated April 20, 1999, does not indicate what may have brought on the incident, and in fact the referral states that the reporting teacher was not even in the room at the time it occurred, if it indeed did occur. Thus, besides the fact that any "harassment" may have been provoked by the other child, the entire "evidence" of the alleged incident is purest hearsay, and is inadmissible to support defendants' motion.

With regard to the May 21, 1999, 5-day in school suspension for allegedly calling an African-American employee a "nigger," Schroeder never called anyone a "nigger," with one exception. Matthew depo. pp. 126, 147, 212. Matthew called a

9

child a nigger after that child called Matthew a fag, and told Matthew that he treated his mom like a "hoe" [whore]. Matthew depo. pp. 212-213.

With regard to the May 26, 1999, incident wherein Matthew allegedly "flipped off" a custodian, Matthew admitted the truth of this incident. Matthew depo. pp. 143-144.

With regard to the May 28, 1999, two day suspension for calling defendant Conroy a "drunk," Matthew admitted the truth of this incident. Matthew depo. pp. 96-97.

With regard to the June 2, 1999, detention for using the word "fuck," Matthew admitted the truth of this incident, explaining that it was done on a dare by another child, and that he did it because he thought that if the other child thought he was brave enough to do that, that the other child would be Matthew's friend. Matthew depo. pp. 154-155.

The exhibits referred to with regard to disciplinary actions against Matthew on pp. 6 and 7 of defendants' motion all follow a pattern similar to the above. That is, they relate disciplinary action for certain events, some of which actually occurred and some of which are fictitious, but none of which discuss the root of the problem, or indicate that anyone sought to determine the root of the problem. Thus, contrary to defendants' claim, Matthew never called girls hermaphrodites. Matthew depo. p. 252. Other recitations by defendants are simply disingenuous: Defendants note that Matthew was placed in "in-school suspension" for fighting with another student on the school bus, but neglected to mention that the same report indicates that the other student was pulling on Matthew's ear and would not let go. See Ex. C, School Bus Conduct Report dated August 27, 1999.

At p. 10 of their memorandum, defendants refer to an incident in which Matthew is described as having "struck another student with a rock." Defendants state that there was absolutely no evidence that Matthew was being harassed as being gay or because of his brother's

10

sexual preferences. However, Matthew testified that another student called him a "little bag" and stated that he was going to " beat the living shit" out of Matthew. So Matthew picked up a rock, and threw it in the general direction of his tormentor, but not directly at him, and the rock bounced off the ground and into a girl. Matthew depo. p. 182. Defendant Wilson observed the entire incident, and Matthew called to him by name for help, but Wilson did not help, but merely continued staring at him. Matthew depo. pp. 182-183. The beating lasted for five or ten minutes. Matthew depo. II p. 107.

At least one teacher also took part in the harassment. Mr. Tashenberg, in the presence of Matthew and the other students, stood in front of the class and stated, "My son came to me yesterday and he said there is the gayest kid in school," and then Mr. Tashenberg said, "Oh, yeah, what's his name," and then he said, "Matt Schroeder," and then he laughed. Matthew depo. II pp. 17-19.

Matthew sometimes engaged in name-calling with other kids, but only after they initiated the name-calling. He did so to stick up for himself to show that he had willpower. Matthew depo. p. 196.

Defendant Wilson told Matthew that if he had any problems, he should tell him, but when Matthew came to him with his problems, Wilson told him to "handle it yourself," Matthew depo. p. 226, or not to be a tattletale. Matthew depo. p. 227.

Since Matthew has transferred to Deveaux junior high, he no longer speaks out on gay rights issues, because he does not want to get beat up. Matthew depo. p. 256.

11

Matthew's mother Sandra testified that at the beginning of Matthew's fifth grade year, his relationship with his peers was pretty good, and that kids were coming over to play. Sandra depo. p. 165.

After Matthew was beaten up on the bowling alley bus, Sandra obtained a restraining order which ordered that the two perpetrators stay away from Matthew. She gave a copy of the restraining order to defendant Conroy. Sandra depo. pp. 194-195. She did this early in the school year, probably within the first week of school. Sandra depo. p. 196. When Matthew reported the Sandra that the perpetrators would not stay away from him, she wrote letters to Mrs. Judy informing her of that fact. Ibid. The second day of sixth-grade, Sandra informed defendant Conroy that, contrary to the restraining order, one of the perpetrators of the bus attack on Matthew was in his band class. At that time, he told her that he needed to see a copy of the order. Sandra depo. pp. 204-205. When Matthew informed Sandra that the perpetrator had started harassing him in the band class, flipping him off and calling him a little fag, Matthew and Sandra informed defendant Conroy about what had occurred. Sandra depo. pp. 205-206. Even after Conroy was given a copy of the restraining order, he specifically refused to remove Matthew's attacker from the band class. Sandra depo. p. 206-207. After an incident in which Matthew was accused of calling another student names, and after getting Matthew's side of the story, which was that the other student had been calling him fag and similar names, Sandra gave defendant Conroy this information. Sandra depo. pp. 211-212. By November 1998, she had on four or five occasions informed Conroy of similar occurrences of Matthew being called fag or other similar names. Sandra depo. p. 212. Other things she told Conroy about was how Ashley,

12

one of his attackers on the bus, was tormenting Matthew in more subtle ways, by getting other kids to do it, and by flipping him off by putting her finger on her face.  Sandra depo. pp. 212-213.

After Matthew reported to Sandra want defendant Conroy had said to Matthew, asking them if he was a fag, and telling him he should play football, Sandra confronted Conroy about the accusations.  Conroy responded that if Matthew would just follow what the other kids were doing, that he could have friends if this kind of stuff would stop, but as long as Matthew kept on talking about it, he was going to keep on getting beat up and being called names.  Sandra depo. pp. 217-218.  Conroy also admitted that he told Matthew that he could learn to like girls, and that he told Matthew that he should play football.  Sandra depo. p. 218.

Defendants on p. 22 of their memorandum reproduce a portion of Sandra's transcript. The portion reproduced by defendants reads as follows:

Q:   ... in fact, I want to talk to you about that.  As you look back at the sixth-grade incidents, in fact, as you look back at the sixth and seventh-grade incidents, it's notable that none of those had any reference to Matthew being called a fag or queer or any other name that may relate to his sexual orientation or anybody else's, anything that nature?

A.   Right.

However, un-reproduced by defendants, the exchange continued:

Q.   Yet Matthew claims that he was on a regular basis called names like that.  Did you ever talk to anybody at the school about why none of those references were ever included in any of these disciplinary records?

A.   Well, I actually just thought they were always putting everything in such shorthand, everything, why was it so short.  They always sent the paper home.  It was after they always spoke to Matthew too.  They would just write it down, and it would be off and mailed to me soon.  I would be in the next day to tell them Matthew side of the story so they never rewrote it up.  So that was another reason why nothing was ever wrote.  They never wrote it up.

13

Sandra depo. p. 244.

After the incident on a school bus in which two children pushed Matthew up against a window and told him to kiss the window and call him a little fag, Sandra informed defendant Wilson of Matthew's side of the story. Wilson simply replied that, "that's neither here nor there." When Sandra expressed concern over the fact that Matthew had been punished and apparently the other boys had not, Wilson simply became very rude and hostile and refused to cooperate with her. Sandra depo. 248-250. Shortly thereafter, Sandra informed defendant Conroy of the conversation with defendant Wilson. Sandra depo. p. 251.

On another occasion, Sandra told defendant Conroy that another student had said to Matthew, "I bet you and your brother fuck each other." Sandra depo. p. 253.

Sandra also informed defendant Conroy of Matthew's side of the incident wherein Matthew was pushed into a urinal and called "little fag." Sandra depo. p. 261. She also informed Conroy why Matthew was not personally telling Conroy everything that was happening to him.

Sandra testified that the reason they did not bring Matthew back to Gateway Middle School after he left the fall of seventh-grade was that it would not be good for Matthew to send him back there, and that this was also the evaluation of Matthew's psychiatrist. Sandra depo. p. 282.

In an affidavit attached hereto as exhibit 1, Meredith Weiss testified that she has known Matthew since second grade. They became best friends starting in third grade. They went to the same schools until he left school in seventh-grade. They were in the same grade. For second through fifth grades, they attended Fort Miami school in Maumee, Ohio. For sixth and seventh-grade, they attended Gateway School. Weiss affidavit ¶ 2. Starting in fifth grade, Weiss often

14

heard children at the school calling Matthew derogatory names like "gay," "queer" and "fag." This continued in sixth and seventh-grade. This name-calling happened on almost a daily basis, and occurred in the school building and on the school grounds. Weiss affidavit ¶ 3. When Weiss first knew Matthew, he was always a very fun person to be around, always happy, funny, and caring. He was not a cruel or mean person. Weiss never heard him initiate name-calling with other kids. This continued until when they were in fifth grade. Starting in fifth grade, toward the end of the school year, Weiss noticed a dramatic change in Matthew. He no longer was happy all the time. He became more nervous. He still was a very nice person, and not cruel or mean to other people. However, he wasn't the same anymore. That is, he rarely was funny any longer; he was often sad and somber. He did not talk as much, and often appeared depressed. Weiss affidavit ¶ 4.

## IV.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed. R. Civ. P. 56(e)).

15

In deciding the motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non- moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

**B.      Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Claims under 42 U.S.C. § 1983**

**1.      Defendants violated plaintiff's First Amendment right of free speech and his right to equal protection.**

Plaintiffs' complaint contains separate claims for violation of Matthew Schroeder's right to freedom of expression is guaranteed by the First and Fourteenth Amendments, and his right to equal protection under the fourteenth amendment. However, defendants have chosen to address the two together, and Plaintiffs therefore respond similarly, more or less following Defendants' memorandum.

Defendants contend that because they never specifically prohibited Matthew from speaking out on gay issues, he was not deprived of his right to free speech. However, that is not the standard for a First Amendment claim.

A defendant's actions are sufficiently serious to violate plaintiff's First Amendment rights if they would "deter a person of ordinary firmness" from exercising the First Amendment right at stake, *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982), or, objectively viewed, would "be likely to chill the exercise of constitutionally protected speech of others in a comparable position." *Reichert v. Draud*, 511 F.Supp. 679, 686 (E.D.Ky.1981).

16

There is little case law involving the concept of chilling of speech in the context of student speech in the absence of deliberate prior restraint. In the employment context, the courts have stated that there are no bright line rules, and that courts must determine each case on the basis of its specific facts. *Wannamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir.1997). In the First Amendment context, courts must be particularly careful because a chilling effect on protected speech need not be great in order to be actionable. See *Elrod*, 427 U.S. at 359 n. 13; Bart, supra, 677 F.2d at 625; *Bernheim v. Litt*, 79 F.3d 318, 325-26 (2d Cir.1996).

The courts have generally applied a similar standard in non-employment context. Hence, the Tenth Circuit Court of Appeals has noted that for such cases:

> We ... require[ ] proof of the following elements: (1) that the plaintiff "was engaged in constitutionally protected activity"; (2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell*, 219 F.3d at 1212 (*quoting Lackey*, 1999 WL 2461, at *3). Other circuits follow this approach. *See generally Carroll v. Pfeffer*, 262 F.3d 847, 850 (8th Cir.2001); *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir.1999); *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998).

*McCook v. Spriner School Dist.*, 44 Fed.Appx. 896, 904 (10th Cir. 2002).

Defendants do not contend that Matthew was not engaged in constitutionally protected activity when he spoke out on gay issues. Furthermore, defendants have not argued that their adverse action, discussed in detail below, was not substantially motivated as a response to plaintiff's exercise of constitutionally protected conduct. Because defendants, as the moving party, bear the burden of identifying every basis which they claim entitles them to summary judgment, and of pointing to evidence in the record supporting that basis, plaintiffs have no

17

obligation to support that element of the First Amendment claim.  However, even if plaintiffs had such a burden, that burden has been easily met by virtue of the abundant evidence that often other students harassed plaintiff, but it was plaintiff who was disciplined, and not the other students. Furthermore, defendant Conroy's comments, questioning whether Matthew was also "a fag," stating that "you can learn to like girls," and suggesting that he go for the football team, clearly demonstrate a predisposition toward allowing the harassment to continue.

Plaintiffs also contend that Matthew's speech was not actually chill, as he continued to speak out on gay issues.  However, the legal standard, as noted above, is not whether Matthew was actually deterred from speaking out, but whether the actions or in actions of defendants would have deterred a person of ordinary firmness from speaking out.  The fact that Matthew may have been a person of extraordinary firmness does not protect defendants from their actions. Furthermore, as set forth in the statement of facts, at Matthew's next school, he did cease speaking out on gay issues, exactly because of his experience with Maumee schools' failure to protect him.

Defendants also argued that they had no duty under § 1983 to prevent private persons from violating Matthew's constitutional rights.  Defendants cite *Oldham V. Cincinnati Public Schools*, 118 F. Supp. 2nd 867, 875 (S.D. Ohio 2000) for this proposition.  However, *Oldham* is distinguishable on its face.  The *Oldham* dealt with a more or less discrete act of violence against a minority student; there was no evidence showing that it was the custom or policy of the school to fail to protect minority students.  The court specifically noted that it had

> no occasion to decide here whether a different quantum of evidence might support
> an action against Defendants in a different context; that is why we must conclude
> that, in this case, the evidence presented by Plaintiff simply does not amount to a

18

custom of tacit authorization of physical abuse or obvious deliberate indifference in regards to Plaintiff's constitutional rights.

*Oldham ex rel. Young v. Cincinnati Public Schools* 118 F.Supp.2d 867, 876

(S.D.Ohio,2000). In the instant case, plaintiffs have set forth evidence from which a jury,

construing the evidence most favorably toward plaintiffs, as they would have the right to do,

could find that for three years, Maumee schools, through their teachers and administrators,

including the principal and assistant principal of Gateway School, were aware that plaintiff was

the target of both cruel taunts and barbs and physical abuse from other students. Administrators

gave lip service toward remedying the problem, but the problem continued until Matthew had no

choice but to leave school.

In a very recent case far more similar to the instant circumstances than was *Oldham*, the

Court of Appeals for the Ninth Circuit held that a school system's summary judgment was

properly denied. In *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136-37 (9th

Cir.2003), the plaintiffs alleged that during their time as students in public schools within the

district they suffered anti-gay harassment by their classmates. The plaintiffs were, or were

perceived by other students to be, lesbian, gay, or bisexual, although, and in the instant case, not

all of the plaintiffs were actually gay. Plaintiffs alleged that while teachers and administrators

promptly responded to other forms of discrimination against other students, they responded with

inadequate disciplinary action in the case of the plaintiffs. *Flores* at 1132 -1133.

The court first found that the plaintiffs were members of an identifiable class for equal

protection purposes because they allege discrimination on the basis of sexual orientation. Id. at

1134-1135. The court also found that plaintiffs had submitted evidence tending to prove that

19

defendants had acted with deliberate indifference, which, citing ***Gant v. Wallingford Bd. of Educ.***, 195 F.3d 134, 140 (2d Cir.1999), the court held was sufficient to meet the element of unconstitutional motive. The court stated that ""[d]eliberate indifference" is found if the school administrator "respond[s] to known peer harassment in a manner that is ... clearly unreasonable."" ***Flores*** at 1135, citing ***Davis v. Monroe County Bd. of Educ.***, 526 U.S. 629, 649, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

In the instant case, there is abundant evidence that defendants Wilson and Conroy were well aware of the harassment against plaintiff, and refused to give more than lip service against it. Indeed, the record is replete with evidence that other children would initiate confrontations with plaintiff, but that it was plaintiff who would be disciplined. Furthermore, there is evidence from which a jury could find that defendant Wilson actually observed plaintiff being beaten a few yards away, and refused to intervene.

Defendants at page 18 of their memorandum contend that there was no evidence that Matthew was discriminated against because of the perception that he was gay, but that rather he was simply a problem child. They contend that they investigated each incident, and that the "investigations always revealed that Schroeder was guilty of misconduct and he was disciplined accordingly." And construed in the light most favorable to defendants, that is exactly what is shown. However, it is plaintiffs, and not defendants, who are entitled to have the evidence construed most favorably to them. And so construing the evidence, plaintiffs have established that defendants were repeatedly made aware that many of the incidents in which Matthew was involved had their origin in the sexual orientation-related harassment of Matthew. There is direct evidence (Conroy's "fag" comments; Wilson's refusal to intervene in the beating of Matthew)

tending to prove that both of the individual defendants were motivated improperly by Matthew's perceived sexual orientation or by his refusal to stop speaking out on gay issues.

The fact that many of the reports did not mention sexual orientation comments by other students as being involved, does no more than create a factual issue. It is not disputed that the reports were made out by someone other than Matthew, that defendants were informed of the true circumstances, and that they did not amend or supplement the reports to reflect the information provided to them by Matthew and Matthew's mother. In fact, by very virtue of the fact that the sexual-orientation comments were not included, the reports raise an inference that the administration simply did not want to address the problem.

By virtue of their own admissions, and in light of plaintiffs' right to have the evidence construed in their favor, defendants themselves offer weighty evidence that they treated Matthew discriminatorily. On page 18 of their memorandum, and in the cited passages of their own depositions and exhibits, defendants admit that Matthew himself was disciplined for allegedly calling another student a "lesbian" and for allegedly calling girls "hermaphrodites." Matthew denied ever using either of those terms. Yet, notwithstanding repeated notification by Matthew and by Matthew's mother that Matthew was the constant victim of sexual-orientation comments by other students, defendants refused to take meaningful action to stop it. Again, construing the evidence in the light most favorable to defendants, they did everything they could and it was all Matthew's fault. However, construing the evidence in the light most favorable to plaintiffs, defendants did virtually nothing, and the harassment continued until plaintiff was virtually driven out of school.

21

The fact that the school had a sexual harassment policy which prohibited sexual harassment is likewise unavailing.  Construed most favorably to plaintiffs, the evidence shows that the policy was completely ignored, at least as applied to Matthew.

Because plaintiffs have set forth specific allegations which go to every element of the § 1983 claim, defendants are not entitled to summary judgment.

2. **Defendant Maumee Board of Education may be held liable on plaintiff's § 1983 claim because evidence demonstrates that plaintiff was deprived of his rights of free speech and equal protection due to a policy or practice of the board.**

Defendants claim that the board may only be held liable to plaintiffs for a § 1983 claim if plaintiffs establish that the execution or enforcement of an official policy or custom in the school district caused the alleged violation of Matthew's rights.  Defendants, apparently recognizing that established custom may substitute for policy, assert that plaintiffs have not produced evidence that there was a custom of discriminating against those who were gay or perceived to be gay.

Government defendants may be found liable if plaintiffs can establish that an officially executed policy, or the tolerance of a custom, leads to, causes or results in the deprivation of a constitutionally protected right.  An act performed pursuant to a "custom" not formally approved by an appropriate decision maker may subject a government entity to liability on the theory that the relevant practice is so widespread as to have the force of law. *Van Hull v. Marriott Courtyard*, 87 F.Supp.2d 771, 779 (N.D.Ohio, 2000).

To show custom, the plaintiff may adduce evidence that a policy-maker (1) had notice that a constitutional violation was likely to occur, and (2) acted with deliberate indifference to the risk. *Hernandez v. Borough of Palisades Park Police Dept.*, 58 Fed.Appx. 909, 912-913, 2003

22

WL 202441 at *3 (3d Cir. 2003), citing *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir.2000).

Plaintiffs have set forth evidence demonstrating a three-year custom of ignoring or tolerating the sexually-oriented harassment against Matthew. Furthermore, they have shown that the policy makers delegated by the school board, namely the principal and assistant principal of Gateway Middle School, were aware of that harassment for one and a half years. It follows that the school board is not entitled to summary judgment on plaintiffs' § 1983 claims.

## C. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Title IX Claim.

Defendants contend that plaintiffs cannot demonstrate that the school board was deliberately indifferent to sexual harassment about which it had actual knowledge, or that the sexual harassment was so severe, pervasive and objectively offense and that it could be sent to have systematically deprived the victim of access to educational opportunities in the school.

First, with respect to the actual knowledge requirement, defendants contend that there is no evidence that defendants Conroy and Wilson knew that Matthew faced a substantial threat of sexual harassment.[3]

Defendants contend that they investigated the incidents involving Matthew's alleged in his behavior, and that they were unaware of any such allegation of harassment. However, construing the evidence most favorably toward plaintiffs, it is clear that both Matthew and his mother repeatedly notified both Wilson and Conroy, as well as several teachers, about what was

---

[3]Defendants do not, and could not, contend that personal knowledge of school board members is required. As they implicitly acknowledged, notice to the school board's delegated policymakers, in this case defendants Conroy and Wilson, is notice to the board.

23

going on.  Furthermore, Matthew's mother provided Conroy with the restraining order against the students who had beaten Matthew on the bowling alley bus.  Defendants' self-serving protestations of ignorance of the harassment simply cannot somehow negate this testimony.[4]

Defendant second contention with regard to the Title IX claim similar to their first, in that it relies completely upon self-serving assertions that a thorough investigation was conducted of all of the disciplinary incidents involving Matthew.  As with the knowledge element, the truth or falsity of such assertions is largely within the sole direct knowledge of defendants.  After all, it was defendants, not plaintiffs, who were in control of any investigation.  Furthermore, Matthew and Matthew's mother repeatedly went to defendants concerning Matthew's side of the story.  The resulting frequent discipline of Matthew, failure to amend or supplemented reports to reflect Matthew's side of the story, and the continuing and complete ineffectiveness of defendants' action is in protecting Matthew, constitute evidence from which a jury could reasonably infer that defendants, in spite of a three-year history of harassment of Matthew, simply and unreasonably chose to ignore Matthew's statements.

The testimony of Meredith Weiss, a best friend, that she almost daily heard children at school calling Matthew derogatory, sexual-orientation related names, along with her testimony that she never heard Matthew initiate name-calling with other kids, strongly supports plaintiffs' claims.

---

[4]It should come as no surprise that plaintiffs are not able to definitively state what Defendants Conroy and Wilson knew or did not know.  That information resides exclusively within their brains.  However, plaintiffs surely do not need to offer this kind of proof, but only need offer proof from which a jury could reasonably infer that defendants had notice of the harassment.  Plaintiffs have produced abundant testimony of this nature.

Defendants assert at p. 22 of their memorandum that plaintiffs admitted that none of the investigations turned up support for the allegation that Matthew was being harassed because of the perception that he was gay. However, plaintiffs have admitted no such thing. Defendants have taken a portion of Sandra Schroeder's deposition out of context to support this contention. In their statement of facts, plaintiffs have set forth the testimony immediately following defendants' cited testimony, and it is clear that Sandra was not agreeing that the investigations had not turned up evidence of the harassment, but only that the reports did not reflect the harassment. She stated:

> **A:      Well, I actually just thought they were always putting everything in such shorthand, everything, why was it so short. They always sent the paper home. It was after they always spoke to Matthew 2. They would just right down, and it would be off and mailed to me soon. I would be in the next day to tell them Matthew side of the story so they never rewrote it up. So that was another reason why nothing was ever wrote. They never wrote it up.**

As with so much of defendants memorandum, their contention that they did all that they could do relies upon the version of the facts most favorable to them. However, they are not entitled to any such construction; it is plaintiffs who are entitled to that construction, and construing the facts most favorably to plaintiffs, it is clear that defendants did virtually nothing in response to their knowledge of the harassment.

Finally, defendants contend that any harassment of Schroeder was not so severe and pervasive and objectively offense and that it deprived Matthew of his educational opportunities. Here, defendants most blatantly ignore plaintiffs' evidence and construing the evidence in their own favor. Noting correctly that damages under title IX are not available for near name-calling and teasing, defendants assert that

25

really, that is all that is alleged in this case. There is no evidence in any of the investigation materials that Schroeder was ever physically assaulted at any Maumee school based upon the perception that he was gay. Furthermore, the alleged harassment was not a reason Schroeder was removed from Gateway school. Instead, he was voluntarily removed from the school by his parents after numerous incidents of violent behavior on his part.

Once again, construed most favorably to defendants, that is what the evidence no doubt shows. However, Matthew testified to several distinct and serious instances of physical abuse based upon perceived sexual orientation or upon his speaking out on gay rights. Furthermore, there is absolutely no evidence whatsoever that the Schroeder's removed Matthew from gateway school for any purpose reasonably construed as voluntary. Rather, the evidence would easily support a jury finding that the Schroeders removed Matthew from gateway school solely because of the harassment and because of defendants' refusal to deal with the harassment.

## V.    CONCLUSION

A jury could reasonably find that Matthew Schroeder was deprived of his right to free speech, to the equal protection of the law, and of his right to the educational opportunities guaranteed by title IX. The construed most favorably to plaintiffs, any disciplinary problems caused by Matthew Schroeder were as a result of the constant sexual-orientation related torment by other students, and defendants' refusal to deal with that torment.

Respectfully submitted,

Thomas A. Sobecki (0005210)
520 Madison Ave. Suite 811
Toledo, OH 43604
Telephone: 419-242-9908
Fax: 419-242-9937

26

## CERTIFICATION

I hereby certify that a copy of the foregoing Response to Defendants' Motion for Summary Judgment was served on James L. Schuller, Schuller Law Office, 3450 West Central, Suite 242, Toledo, Ohio 43606, this 29th day of August, 2003. by u.s. mail

Thomas A. Sobecki (0005210)
520 Madison Ave. Suite 811
Toledo, OH 43604
Telephone: 419-242-9908
Fax: 419-242-9937

27

# AFFIDAVIT

State of Ohio )
) ss.
County of Lucas )

1. My name is Meredith Weiss. I am 16 years of age. My date of birth is December 5, 1986. I am competent to testify to the matters stated in this affidavit. The information contained in this affidavit is based on my personal knowledge.

2. I have known Matthew Schroeder since second grade. We became best friends starting in third grade. We went to the same schools until he left school in 7th grade. We were in the same grade. For second through fifth grades, we attended Fort Miami School in Maumee, Ohio. For 6th and 7th grades, we attended Gateway School.

3. Starting in 5th grade, I often heard children at the school calling Matthew derogatory names like "gay," "queer" and "fag." This continued in 6th and 7th grades. It happened on almost a daily basis. This name calling occurred in the school building and on the school grounds.

4. When I first knew Matthew, he was always a very fun person to be around with, always happy, funny, and also caring. He was not a cruel or mean person. I never heard him initiate name calling with other kids. This continued until when we were in 5th grade. Starting in 5th grade, toward the end of the school year, I noticed a dramatic change in Matthew. He no longer was happy all the time. He became more nervous. He still was a very nice person, and not cruel or mean to other

1

people.  However, he wasn't the same amymore.  By this, I mean he rarely was funny any longer; he was often sad and somber.  He didn't talk as much.  He often appeared depressed.

5. I swear that the information contained in this affidavit is true to the best of my knowledge and belief.

Meredith Weiss

Subscribed and sworn before me this _____ day of July 2003.

Notary Public

THOMAS A. SOBECKI, Attorney at Law
Notary Public, State of Ohio
My Commission has no Expiration Date
Section 147.03 R. C.

2

## CERTIFICATION

1. My name is Thomas A. Sobecki.  I am the attorney for the plaintiff in Case No. 3:00cv7311, titled *Matthew Schroeder, et al. v. Maumee Board of Education, et al.*, presently pending in the United States District Court for the Northern District of Ohio, Western Division.

2. I certify that this is a standard track case.  I also certify that plaintiff's response to defendants' motion for summary judgment is in excess of 20 pages.  Finally, I certify that I am filing a motion with the Court this day requesting permission for the Court to accept plaintiffs' response brief of 27 pages, excluding pages that are not normally counted as part of the page limitation.

Thomas A. Sobecki